1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CESAR CORTES, Individually and On Behalf of All Others Similarly Situated,<br><br>                                        Plaintiffs,<br><br>        vs.<br><br>MARKET CONNECT GROUP, INC., a Delaware Corporation; and DOES 1 through 10, Inclusive,<br><br>                                        Defendants. | CASE NO. 14cv784-LAB (DHB)<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO CERTIFY CLASS** |

        Cesar Cortes filed this putative class action after his employer, Market Connect Group, Inc. ("MCG"), allegedly violated California labor laws. MCG removed this action from state court, and less than a year later, Cortes filed the motion now pending before the Court.

**I.    Background**

        MCG is a nationwide service organization that partners with retailers and commercial brands to boost sales. (Docket no. 30 (Amended Complaint), ¶ 3.) It employs hourly non-exempt sales staff, which MCG calls "field representatives," who work at retail stores and promote sales. But not all representatives are alike. They have various duties, depending on whether they are assigned to be merchandisers, brand ambassadors, or demonstrators.

        All employees, regardless of their duties, were sent materials to read before their assignments. After each assignment, they were required to complete online surveys. (Docket no. 36-22 (Cortes Decl.), ¶ 9.) Both tasks were done through online timekeeping systems, which MCG used to manage employees. (Docket nos. 36-1 (Motion), 3:23–28; 50-2, 18–20.)

Two timekeeping systems were used during the relevant class period. Between January 2010 and January 2013, MCG used a software system called Komtel, and in February 2013, it switched to a system called Natural Insight. (Docket no. 36-16 (Bergmark Decl.), ¶ 10.) Both systems recorded time in chunks. (Docket 52-2, 18 (Leader Decl.), ¶ 6.) If employees split their time between shifts or between different activities, gaps in shift times weren't captured. Further, neither system allowed employees to record meal or rest breaks. (Am. Compl., ¶ 16.) But both let them download pre-shift assignment materials and submit surveys after assignments were completed. (Leader Decl., ¶¶ 6, 8.)

The systems were different in some ways. Komtel allowed employees to record time in 30-minute increments, with fractions rounded up. (*Id.*) But it didn't let employees record time spent on a specific activity. To account for otherwise "non-project related tasks," MCG paid an additional 2% of recorded time; this was intended to compensate employees for administrative tasks. (Docket nos. 50-2, 35; 50-2, 59.)

Natural Insight, the system now in use, allows employees to distinguish recorded time as either service time, administrative time, or travel time. (Leader Decl., ¶ 8.) MCG defines service time as all project/assignment-related work time, time spent preparing for a project, and time spent completing surveys after in-store work. (*Id.*) Administrative time refers to project-related emails, phone calls with MCG staff, and time spent on scheduling. (*Id.*) Travel time refers to time spent traveling between stores on the same day. (*Id.*)

Cortes worked as a merchandiser between September 2010 and October 2014. (Am. Compl., ¶ 19.) Generally, MCG employees are not subject to daily observation or instruction. (Docket no. 52-2, 6 (Grasso Decl.), ¶ 9.) To help fill that gap, MCG issues a standardized, nationwide Field Handbook (the "Handbook"). (Am. Compl., ¶¶ 5–18.) MCG issued several updated versions of the Handbooks for 2010, 2012, and 2014. (Docket no. 36-1, 4:13–15 and n.10.) The 2012 and 2014 Handbooks are substantially similar.

The parties contest the significance of these Handbooks. Cortes says they outlined the company's employment policies and procedures (*id.*), but MCG argues they amount to written guidelines that may not reflect actual practices. (Docket no. 52 (Opp'n), 19:9–12.)

Cortes says MCG violated California's labor laws through the combined effect of its Handbook policies, actual practices, and timekeeping systems. He now seeks classwide relief.

## II.    Legal Standard

### A.    Class Certification Generally

"A party seeking class certification must satisfy the requirements of Fed. R. Civ. P. 23(a) and the requirements of at least one of the categories under Rule 23(b)." *Wang v. Chinese Daily News*, 737 F.3d 538, 542 (9th Cir. 2013).

The four requirements of Rule 23(a) are:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  These are commonly referred to as the numerosity, commonality, typicality, and adequacy requirements. The Court must perform "a rigorous analysis [to ensure] that the prerequisites of Rule 23(a) have been satisfied." *Wal-Mart Stores v. Dukes*, 131 S.Ct. 2541, 2551 (2011). Cortes seeks certification under Rule 23(b)(3), which applies where common questions predominate over individualized ones and a class action is the superior mechanism for dispute resolution.

"In determining the propriety of a class action, the question is not whether the plaintiff has stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974) (internal quotation marks and citations omitted). Therefore, the Court considers the merits of the underlying claims to the extent that the merits overlap with the Rule 23(a) analysis, but does not determine whether Cortes actually could prevail. *See Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 981, 983 n.8 (9th Cir. 2011).

Although the Court must generally accept the substantive allegations made in the complaint as true, it must also consider the nature and range of proof necessary to establish those allegations. *See In re Petroleum Prods. Antitrust Litig.*, 691 F.2d 1335, 1342 (9th Cir.

1982); *Gomez v. Rossi Concrete, Inc.*, 270 F.R.D. 579, 585 (S.D. Cal. 2010).  "In addition, the court may consider supplemental evidentiary submissions of the parties."  *Keilholtz v. Lennox Hearth Products Inc.*, 268 F.R.D. 330, 335 (N.D. Cal. 2010).  "Neither the possibility that a plaintiff will be unable to prove his allegations, nor the possibility that the later course of the suit might unforeseeably prove the original decision to certify the class wrong, is a basis for declining to certify a class which apparently satisfies Rule 23."  *United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO, CLC v. ConocoPhillips Co.*, 593 F.3d 802, 809 (9th Cir. 2010) (citation and brackets omitted).

### 1.    Rule 23(a)

Commonality requires that there be questions of law or fact common to the class. Fed. R. Civ. P. 23(a)(2). "What matters to class certification is not the raising of common questions . . . but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Dukes*, 131 S.Ct. at 2551 (citation omitted). It is construed permissively, and indeed less rigorously than the predominance requirement of Rule 23(b)(3). "All questions of fact and law need not be common to satisfy the rule." *Id.* at 2562.  One "significant question of law or fact" common to the class may be sufficient to warrant certification.  *Abdullah v. U.S. Sec. Associates, Inc.*, 731 F.3d 952, 957 (9th Cir. 2013) (quoting *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 589 (9th Cir. 2012)).

The typicality inquiry under Rule 23(a)(3) requires that the claims or defenses of the representative parties be typical of the claims or defenses of the class.  Fed. R. Civ. P. 23(a)(3).  The representative claims don't need to be "substantially identical" to those of absent class members, just "reasonably coextensive." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998).

Rule 23(a)(4) permits certification of a class only if the "representative parties will fairly and adequately protect the interests of the class." This factor requires that the proposed representative Plaintiffs do not have conflicts of interest with the proposed class, and that Plaintiffs are represented by qualified and competent counsel who will vigorously prosecute the action on the class's behalf.  *Hanlon*, 150 F.3d at 1020.

1

### 2.    Rule 23(b)

2        In addition to establishing commonality, Cortes must still prove that common questions

3   of law or fact predominate over questions affecting only individual class members. Fed. R.

4   Civ. P. 23(b)(3). The predominance inquiry tests whether proposed classes are sufficiently

5   cohesive to warrant adjudication by representation.  *Amchem Prods., Inc. v. Windsor*, 521

6   U.S. 591, 623 (1997).  "When common questions present a significant aspect of the case

7   and they can be resolved for all members of the class in a single adjudication, there is clear

8   justification for handling the dispute on a representative rather than on an individual basis."

9   *Hanlon*, 150 F.3d at 1022 (quotation omitted).

10        Superiority requires consideration of  four factors. *See Zinser v. Accufix Research*

11   *Inst., Inc.*, 253 F.3d 1180, 1190 (9th Cir. 2001).  They are:

12        (A) the class members' interests in individually controlling the prosecution or
          defense of separate actions;

13

14        (B) the extent and nature of any litigation concerning the controversy already
          begun by or against class members;

15        (C) the desirability or undesirability of concentrating the litigation of the claims
          in the particular forum; and

16

17        (D) the likely difficulties in managing a class action.

18   Fed. R. Civ. P. 23(b)(3). When analyzing these factors, the Court must "focus on the

19   efficiency and economy elements of the class action so that cases allowed under subdivision

20   (b)(3) are those that can be adjudicated most profitably on a representative basis." *Zinser*,

21   253 F.3d at 1190 (internal quotations and citations omitted).

22   **III.    Preliminary Matters**

23        **1.    Evidentiary Objections**

24        MCG and Cortes both make evidentiary objections. MCG moves to strike a series of

25   statements made by Cortes' expert, Brian Bergmark. (*See* Docket no. 52-3.) For example,

26   MCG cites the Federal Rules of Civil Procedure to argue that Bergmark isn't qualified as an

27   expert, so his statements should be stricken. Cortes disputes the veracity of Valerie Kissich

28   and moves to strike her declaration in support of MCG's opposition. (*See* Docket no. 53-6.)

1    But a motion to certify a class is a preliminary procedure; courts don't require strict

2    adherence to the Federal Rules of Civil Procedure or the Federal Rules of Evidence. *See*

3    *Blackie v. Barrack,* 524 F.2d 891, 901 (9th Cir.1975). "[E]vidence presented in support of

4    class certification need not be admissible at trial." *Dominguez v. Schwarzenegger*, 270

5    F.R.D. 477, 483 n.5 (N.D. Cal. 2010). The objections are overruled. But ultimately,

6    consideration of this evidence doesn't change the outcome.

7         **2.     Citations and Record Evidence**

8    The parties lodged numerous exhibits, declarations, and other documents in support

9    of their motions, but their briefing does not always adequately cite it. To the extent the parties

10   failed to cite evidence, the Court is not required to search it out for them. *See Orr v. Bank of*

11   *America*, 285 F.3d 764, 775 (9th Cir. 2002) (holding that failure to provide citations to exhibits

12   warranted exclusion of evidence offered in opposition to motion).

13   **IV.   Discussion**

14   Cortes seeks to certify the following class and subclasses, defined as:

15   All current and former, non-exempt, hourly employees of MCG in California
     from January 13, 2010 to the present (the "**Class**");

16

17   All current and former, non-exempt, hourly employees of MCG in California
     from January 13, 2010 to the present who worked shifts in excess of 5 hours
     (the "**Meal Period Subclass**");

18

19   All current and former, non-exempt, hourly employees of MCG in California
     from January 13, 2010 to the present who worked shifts over 3 ½ hours (the
     "**Rest Break Subclass**");

20

21   All current and former non-exempt, hourly employees of MCG from January
     13, 2010 to the present who paid for the cost of services and supplies (the
     "**Reimbursement Subclass**");

22

23   All former, non-exempt, hourly employees of MCG in California who separated
     employment from MCG between January 13, 2010 and the present (the
     "**Former Employee Subclass**")

24

25   (Motion, 2:12–23.)

26   In the Amended Complaint, Cortes included an unpaid wages and wage statement

27   subclass. But his motion abandons a request for certification of these subclasses, and treats

28   them as part of the overall Class.

1    MCG's opposition focuses on Cortes' failure to establish commonality under Rule

2    23(a) and predominance under Rule 23(b). The Court analyzes each as a subset of the

3    subclass analyses. *See Collins v. ITT Educ. Servs., Inc.*, 2013 WL 6925827, at *3 (S.D. Cal.

4    July 30, 2013) (analyzing commonality and predominance as one, "for efficiency").

5            **A.    Numerosity, Typicality, and Adequacy**

6            Cortes claims that there are 1,150 class members and that this meets the numerosity

7    requirement. MCG doesn't dispute this, and the Court finds the numerosity requirement is

8    met. MCG has also not opposed certification on typicality grounds, and the Court finds this

9    requirement is satisfied as well.

10           Derek Emge, of Emge & Associates, represents that he has handled numerous class

11   actions for over 15 years, including wage and hour actions.  (Docket no. 36-2 (Emge Decl.),

12   ¶ 4.) Suzanne Emge also represents that she has played a central role in multiple class

13   actions. (Docket no. 36-15, ¶ 5.) MCG doesn't dispute that Cortes is represented by qualified

14   and competent counsel, and the Court finds he is.

15           MCG raises concerns about Cortes' credibility as class representative. The general

16   rule is that "unrelated unethical or even criminal conduct is not sufficient to support a finding

17   of inadequacy." *Stanich v. Travelers Indem. Co.*, 259 F.R.D. 294, 315 (N.D. Ohio 2009).

18   Here, MCG alleges that Cortes falsified a work report on one of his assignments. (MCG

19   Opp'n, 24:19–21.) Even if true, this doesn't make a party *per se* inadequate. *Cf. Stanich*, 259

20   F.R.D. at 315 ("[C]ases finding inadequacy based on general credibility concerns have

21   involved putative class representatives with confirmed (as opposed to alleged) credibility

22   weaknesses (e.g. criminal convictions involving dishonesty) or, at least, some connection

23   between the unethical or dishonest conduct and the claims at issue in the class action.")

24           MCG also contends that Cortes didn't understand MCG's policies or how Komtel or

25   Natural Insight worked. This argument might undermine the value of his own testimony, but

26   it's unclear how this would make him an inadequate class representative. The Court finds the

27   adequacy requirement is satisfied.

28   / / /

**B.   Meal and Rest Break Subclasses**

Because commonality and predominance are so closely related, the Court analyzes them together.   In California, an employer is required to provide a meal break to its employees and satisfies that obligation "if it relieves its employees of all duty, relinquishes control over their activities and permits them a reasonable opportunity to take an uninterrupted 30-minute break, and does not impede or discourage them from doing so." *Brinker Rest. Corp. v. Super. Ct.*, 53 Cal. 4th 1004, 1040 (2012).

For rest breaks, "[e]mployees are entitled to 10 minutes rest for shifts from three and one-half to six hours in length, 20 minutes for shifts of more than six hours up to 10 hours, 30 minutes for shifts of more than 10 hours up to 14 hours, and so on." *Id.* at 1029.

The nature of the work, work assignments, and working conditions makes meal and rest break claims difficult for the putative class. The allegations and evidence make clear that the employees worked varying schedules without regular supervision and, depending on their specific duties, with a good deal of independence. Many worked part-time, and some moved from one assignment to another during the day. This means that for a good part of the time, many or most class members may have been effectively able to take breaks as desired. (*See, e.g.*, Docket no. 52-1, 217 (Cortes Depo.), 53:7–10 (testifying that MCG did not know when he was taking breaks and could not have punished him for doing so, because "they weren't there with us"); Docket no. 52-2, 364 (Velasquez Decl.), ¶ 9 ("Because there are no other MCG employees on-site, when I take my breaks, they are uninterrupted."); Docket no. 52-2, 319 (Herman Decl.), ¶ 9 (declaring that she generally does not work in the presence of her supervisor or other MCG employees, and is therefore free to take breaks as needed throughout the day).) Because of this, it is difficult to determine to what extent class members were denied breaks.

Another problem is that much of the evidence consists of conclusory declarations, some of which say class members were given required breaks, and some of which say they were denied required breaks. The problem here is that what constitutes giving an employee a required rest or meal break is a legal conclusion. Much of the evidence, from both parties,

merely gives employees' own bare conclusions about whether MCG complied with California law. Some of them are demonstrably mistaken, and in a few cases employees thought they were entitled to more or longer breaks than California law requires. (*See, e.g.*, Docket no. 52-2 at 307 (DeGuzman Decl.), ¶ 9 (". . . I was told that I should take a 15-minute break every two hours. . . . I generally take a 15-minute paid rest break every two hours that I work."); *id.* at 308, ¶ 10 (declaring that she understood she was entitled to a one-hour paid meal break whenever she worked a six-hour shift); Docket no. 52-2 at 313 (Economou Decl.), ¶ 11 (". . . I know that I am permitted to take paid 15-minute rest breaks every two hours.").)

Even where employees declared they had not been provided rest or meal breaks, there is no way to know whether their own understanding of what it means to provide a break aligns with state law.  At least one declaration and Cortes' deposition testimony suggest that some class members may have equated a break with a specific instruction to go on break. (*See, e.g.,* Docket no. 36-27 at 2 (Fether Decl.), ¶ 4 (declaring that she "received a 10-minute rest break" when working with a manager, and "was never provided with any rest breaks" at other times); Docket no. 52-1(Cortes Depo.), 200:6–25 (testifying that he received rest breaks when he was working with a client and the client told him to take a break).)

Cortes also points to the Handbooks as evidence of break violations.  The 2010 Handbook says "Field Associates are permitted breaks based upon the number of hours worked per assignment. Your supervisor will inform you of your break eligibility." (Docket no. 50-2, Ex. B, 320.)  The policy itself isn't facially defective, and nothing in the plain language suggests it is.

The 2012 and 2014 Handbooks, however, include a break policy that, on its face, violates California law:

> When working the following hours you are permitted to take the following breaks
>
> • 4 hours to 6.5 hours, you are permitted to take one 15 minute PAID rest break
>
> When working the following hours you are permitted to take the following breaks

14cv784

1         • 7 hours to 8 hours, you are permitted to take one 30 minute UNPAID meal
2         break and one 15 minute PAID rest break . . .

3         • 8 or more hours, you are permitted to take one 30 minute UNPAID meal
        break and one 15 minute PAID rest break during 1st half of shift and one 15
4         minute PAID rest break during 2nd half of shift

5 (Docket no. 50-2, Ex. D, 82.) MCG contends these were a "general guideline" and did not

6 reflect actual in-store practices. (Opp'n, 20:9–11.) Questions of a written policy like this may

7 give rise to common questions, because they apply to employees generally. *See Pena v.*

8 *Taylor Farms. Pac., Inc.*, 305 F.R.D. 197, 216 (E.D. Cal. 2015). But here, there is evidence

9 this written policy was not uniformly applied or followed in California, and MCG has cited

10 evidence that at least some of its employees either took breaks that complied with California

11 law (Opp'n, 9:22–10:2), or followed the policies of the stores in which they worked. (*Id.*,

12 9:9–11.) Furthermore, as noted above, some were told during training that they were entitled

13 to more breaks than the Handbooks mentioned.

14       Cortes also submits the testimony of his expert, Brian Bergmark, who reviewed and

15 analyzed a sample of putative class members' shifts to conclude he can prove violations

16 occurred. He isolated shifts exceeding 5 hours but less than or equal to 10 hours; shifts

17 greater than 5 hours but less than or equal to 7 hours; and shifts greater than 10 hours.

18 (Bergmark Decl., ¶ 23.) Cortes claims that Bergmark's survey identifies violations of

19 California's "5th Hour Rule" and of the "10th Hour Rule."

20       This analysis is of limited use, because it is based on limited data that cannot show

21 what Cortes needs to show. Komtel didn't record meal and rest breaks, so the evidence

22 during that period only shows the total number of hours recorded — nothing else. The mere

23 fact that an employee recorded 7 hours, for example, doesn't mean that the employee didn't

24 take a meal or rest break. Natural Insight recorded more information, but still did not show

25 whether a break was taken — or, if it was not, why not. In a factually similar case involving

26 rest period violations, *Ordonez v. Radio Shack*, 2013 WL 210223, at *7 (C.D. Cal. Jan.17,

27 2013), the court found that such statistical evidence "mischaracterizes any late, short, or

28 missed meal periods as violations." The flaw in the reasoning was that the records did not

show whether the employer failed to provide breaks, or whether employees voluntarily did not take them, started them late, or cut them short. *Id.* The same could be said here, except that the evidence is even weaker. Bergmark was only able to identify shifts during which breaks "may not have been provided." (*Id.*, ¶¶ 23, 27.)

The problem for Cortes is that there is no good evidence showing the entire class was subject to the same non-compliant practice. With regard to meal and rest breaks, there is therefore no question common to the class. *See Ellis*, 657 F.3d at 983. *See also Dukes*, 131 S.Ct. at 2551 ("Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.")

Even if the Court were to find commonality, Cortes has not shown predominance. "[I]t is not enough simply that common questions of law or fact exist; predominance is a comparative concept that calls for measuring the relative balance of common issues to individual ones." *Marlo v. United Parcel Serv., Inc.*, 251 F.R.D. 476, 483 (C.D. Cal. 2008). The key inquiry here is whether Cortes can provide common proof of when class members missed meal and rest breaks, and how frequently the 2012 and 2014 Handbooks' written policy was enforced. *See Abdullah*, 731 F.3d at 964 (holding it is an abuse of discretion to find liability by relying on a facially defective policy "to the near exclusion of other relevant factors touching on predominance," such as competing evidence). *See also Cummings*, 2014 WL 1379119, at *21; *Ordonez*, 2014 WL 4180958, at *6. The amount of variation or possible variation in practice precludes a finding of predominance as to this subclass.

## C.   Reimbursement Subclass

Cortes seeks reimbursement under Cal. Labor Code § 2802(a), which requires employers to reimburse employees for "necessary expenditures or losses" incurred by employees "in direct consequence of the discharge of" their duties. The duty to reimburse is triggered when "the employer either knows or has reason to know that the employee has incurred a reimbursable expense." *Stuart v. RadioShack Corp.*, 641 F. Supp. 2d 901, 903 (N.D. Cal. 2009). Cortes alleges two general categories of unreimbursed expenses: (1) technology expenses (i.e., expenses associated with employees' use of computers, printers,

internet connections, and cameras); and (2) mileage expenses (i.e., expenses associated with employees' use of vehicles to travel between multiple assignments on the same day). (Docket no. 30, ¶¶ 11–13; Docket no. 36, 14–17.)   The Amended Complaint also alleges MCG failed to reimburse for pens, pencils, paper pads, and cell phones, but Cortes doesn't mention certification on these issues in his motion.  He provides no evidence to substantiate his allegations regarding pens, pencils, and paper pads, and scant evidence regarding cell phones.  (Docket no. 36-30 (Seales-Perkins Decl.) at 6.) The Court construes these claims as abandoned.

### 1.    Technology Expenses

All three Handbooks require employees to have "access to a personal computer and the internet" and discourage reliance on "outside sources" such as libraries or copy shops. (Docket no. 52-2 at 35, 59, 81.)  This was necessary because MCG required its employees to download and review materials for each new assignment.  (Docket no. 36-6 (Grasso Depo.) at 83–85.)  But MCG didn't reimburse employees for computer expenses during the class period.  (*Id.* at 91.)  And several putative class members contend it didn't reimburse for printing either.  (*See, e.g.,* Docket no. 36-25 (Avalos Decl.) at ¶ 5.)  Cortes, too, contends he used his computer and internet connection to complete MCG assignments.  (Cortes Decl., ¶¶ 4–8.)  Likewise, although all three Handbooks required employees to submit pictures of their work (Docket no. 52-2 at 39, 53, 75), MCG didn't provide employees with a camera or inform them that they could seek reimbursement for the cost of taking pictures, (Grasso Depo. at 93–94), and several putative class members contend they weren't reimbursed for the expenses.  (*See, e.g.*, Avalos Decl. at ¶ 5.)   Thus, there's a significant question concerning the necessity of the technology expenses, and it's common to all putative class members.

MCG argues there's no commonality or predominance because: (1) computers, printers, and cameras are commonly owned household items so some employees didn't incur an expense and (2) not all employees printed instructions because, for example, some had tablet devices.  (Docket no. 52 at 22–23.)  But an employer is required to reimburse

employees for mandatory use of personal items, including personal tablets, even if they don't result in an "extra expense."  *See Cochran v. Schwan's Home Service, Inc.*, 228 Cal. App. 4th 1137, 1144 (2014).  MCG's arguments, therefore, go to the amount of damages.  And "[t]he amount of damages is invariably an individual question and does not defeat class action treatment."  *Blackie v. Barrack*, 524 F.2d 891, 905 (9th Cir. 1975).  Thus, the Court finds commonality and predominance requirements are satisfied with respect to MCG's alleged § 2802(a) liability for technology expenses.

### 2.   Mileage Expenses

Cortes relies on declarations from five putative class members, which demonstrate that some MCG employees were required to travel between assignments, but weren't paid for their travel between assignments.  (*See, e.g.*, Docket no. 36-26 (Carillo Decl.), ¶ 5 ("There were occasions where I would work at two store locations in the same day and I *had* to drive between the two stores.  I was never paid for this time or given any reimbursement for the mileage I drove.  I was never instructed that I could even record this time as work time.") (emphasis added).)  MCG, however, points to evidence that different types of employees were subject to different scheduling requirements.  Merchandisers, for example, were given a deadline for completion of their projects, but could choose the day or days to carry them out. (*See, e.g.*, Grasso Decl., ¶ 11 (". . . Merchandisers are generally free to choose to work multiple projects in a single day, or can spread them out during the course of several days . . . ."); Peters Decl., ¶ 7 (". . . I have the discretion to schedule my merchandising shifts at times that are most convenient for me; I feel like my own boss in setting my schedule.").)  Demonstrators, by contrast, generally work longer hours and usually cannot perform more than one demonstration per day. (*See* Grasso Decl., ¶ 12.)  Although MCG did not discuss the schedules of brand ambassadors, it appears at least some of them can set their own. (*See* Economou Decl., ¶ 9 ("As a Brand Ambassador, . . . I am able to schedule and choose how many hours I work per day and how many days per week.").)

The issue is not whether employees actually drove between assignments, but whether it was necessary for them to do so.  To the extent employees choose to complete multiple

assignments in one day, their mileage expenses aren't "necessary" and don't trigger § 2802(a); *see also Novak v. Boeing Co.*, 2011 WL 9160940, at *3 (C.D. Cal. July 20, 2011). While it appears some class members were required to travel between locations on some days, for some of the class it appears this was optional, and resulted from the employees' own scheduling choices rather than being required by MCG or necessitated by the assignments MCG made. Even if there are common questions regarding mileage expenses, they do not predominate.

## D.   Unpaid Wages

Under California law, an employer must pay an employee for all hours worked, defined as "the time during which an employee is subject to the control of an employer, and includes all the time the employee is suffered or permitted to work . . . ." *Morillion v. Royal Packing Co.*, 22 Cal. 4th 575, 583 (2000). Under this rule, an employer is deemed to have permitted an employee to work if it knew or should have known that its employees were working off-the-clock. *Id.* at 585. "The level of the employer's control over its employees, rather than the mere fact that the employer requires the employees' activity, is determinative." *Id.* at 587.

Cortes alleges three off-the-clock activities common to the class: reading materials, completing online surveys, and travel time between stores. (Docket no. 36-1, 17–21.) There is no dispute MCG required the employees to read materials and complete surveys, but as noted it is unclear to what extent driving between assignments was required. It is undisputed that from the start of the class period until after Natural Insight was adopted, MCG paid employees an additional 2% to compensate them for other required activities. Cortes, however, argues this was insufficient because reading, completing surveys, and driving invariably took considerably longer than 2% of their credited work time.

### 1.   Reading and Completing Surveys

Cortes supports his theory with declarations from numerous former employees saying the 2% did not compensate them adequately for reading materials and completing surveys. (*See* Cortes Decl., ¶ 6 (average of 1 hour per assignment); Docket no. 36-31 (Vasquez Decl.), ¶ 9 (3–5 hours a week); Seales-Perkins Decl., ¶ 8 (1 to 1½ hours per assignment);

Docket no. 36-29 (Ransford Decl.), ¶ 5 (30–40 minutes per assignment); Fether Decl., ¶ 7 (30 minutes to 1 hour per assignment); Carillo Decl., ¶ 7 (average of 1 hour per assignment); Avalos Decl., ¶ 7 (30 minutes to 1 hour per assignment).)

In rebuttal, MCG argues reading time was supposed to be included in total hours worked, and offers some employees' declarations showing that they treated preparation and other administrative time as regular work time, and recorded it as such. (*See* Deguzman Decl., ¶¶ 7,12; Peters Decl., ¶¶ 9, 15; Docket 52-2, 338–39, (Morgan Decl.), ¶¶ 7, 12; Docket no. 52-2, 358–60 (Tudor Decl.), ¶¶ 8, 13; Docket no. 52-2, 329 (Loney Decl.), ¶ 10.) MCG also points out that because demonstrators dealt with the same product repeatedly, they did not need to reread the materials before each new assignment. (*See, e.g.,* Deguzman Decl., ¶ 7; Tudor Decl., ¶ 8.)

One problem for Cortes is while some employees apparently thought they were not supposed to record other tasks as administrative time, an unknown number of the employees knew they were supposed to do this. Another problem is that during the period when Komtel was in use, employees were paid something for administrative work; the only question is whether it was enough.  And during the period Komtel was in use, employees had the benefit of their time being rounded up to the next half hour. Whether this system adequately compensated employees for their work is inherently an individualized question. It is likely some employees were undercompensated, but it is not clear how many.

An additional problem is that, during the period when Natural Insight was in use, employees could record time spent on administrative tasks, and specifically were allowed to record survey time.  (Leader Decl., ¶ 8.) How supervisors and employees interpreted this option, and whether employees reported their reading time as administrative time is another individualized question.

With regard to the tasks of reading materials and completing online surveys, the Court finds few common questions, and those that are present do not predominate.

/ / /

/ / /

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## 2.    Travel Time

"With respect to travel time to and from work or between assignments, the key factors in determining whether it is compensable are whether the employer is controlling the employee and this travel is required." *Green v. Lawrence Serv. Co.*, 2013 WL 3907506, at *6 (C.D. Cal. July 23, 2013) (citing *Morillion*, 22 Cal. 4th at 587–88). The analysis is the same as for the mileage claims, above, and the result is the same as well.

## E.    Wage Statement, Waiting Time, and UCL Subclasses

The claims of these subclasses are derivative of the meal and rest period, unpaid wages, and reimbursement subclasses. *See, e.g.*, *Howard v. CVS Caremark Corp.*, 2014 WL 7877404, at *14 (C.D. Cal. Dec. 9, 2014). The questions of commonality and predominance are resolved as for those subclasses.

## F.    Superiority

The Court has concluded that the question of whether MCG failed to reimburse class members for technological expenses is appropriate for class adjudication. This includes all derivative claims of the Former Employee subclass.[1] With respect to these claims, the Court concludes that common issues predominate, and that to the extent individual issues arise they can be resolved with minimal effort.

The second half of the Rule 23(b)(3) inquiry requires the Court to determine whether class treatment is "superior" to an individual treatment of Cortes' claims. None of the putative class members have shown any interest in controlling prosecution of separate actions. (Emge Decl., ¶ 7.) Cortes' class counsel testified that there has been no similar or related lawsuit related to this action. (*Id.*) And Cortes performed all his work in San Diego County, making the Southern District an appropriate venue for this action. (*Id.*) The Court finds all the requirements satisfied.

---

[1] The parties did not brief or address in any detail the claims of former employees, and could not be sure which claims or subclasses would survive the motion for class certification. Here, it appears the subclass may consist of former employees who, upon separation from service, should have received all the reimbursements due them, and did not. Whether they have valid claims can be decided on a motion to dismiss, however, and need not be decided at this point.

14cv784

1    The fourth factor, which concerns the difficulties in managing a class action, is a close
2    cousin of the predominance requirement.  When this is the case, the predominance analysis
3    can almost double as the superiority analysis. *See, e.g.*, *Dalton v. Lee Publ'n*, 2010 WL
4    2985130 at *9 (S.D. Cal. July 27, 2010) (finding class action to be superior, at least in part,
5    because "common issues predominate and it would be far more efficient to resolve the
6    question of employment status on a class-wide, rather than individual, basis").  "If each class
7    member has to litigate numerous and substantial separate issues to establish his or her right
8    to recover individually, a class action is not superior."  *Zinser*, 253 F.3d at 1192.

9        The amount spent by reimbursement subclass members on technology is
10   individualized. But generally, the quantity of individual damage calculations doesn't defeat
11   class certification. *See* Newberg on Class Actions § 4:54 (5th ed.). Because common issues
12   predominate over individual ones, adjudicating these claims in a single action would promote
13   efficiency and help conserve judicial resources.

14   **V.    Conclusion**

15       For these reasons, the Court **GRANTS IN PART AND DENIES IN PART** Cortes'
16   motion. The reimbursement claims, and claims derivative of them, are suitable for class-wide
17   treatment. These claims are construed, however, to include only technological expenses that
18   were required and necessary to perform the subclass members' jobs. This includes the
19   required use of computers, printers, ink cartridges, printer paper, and cameras, but not cell
20   phones. Because all surviving class claims derive from failure to reimburse for technological
21   expenses, the Court **REDEFINES** the class and subclass as follows:

22
        All current and former non-exempt, hourly employees of MARKET CONNECT
        GROUP, INC. from January 13, 2010 to the present who paid for the cost of
23      technological services and supplies (the "**Class**");

24      All former, non-exempt, hourly employees of MCG in California who are
        members of the Class, and who separated employment from MCG between
25      January 13, 2010 and the present (the "**Former Employee Subclass**").

26   / / /

27   / / /

28   / / /

1    The named Plaintiff, Cesar Cortes, will serve as the class representative.  The Court

2  also determines that the law firm of Emge & Associates can litigate this case competently,

3  and **APPOINTS** Derek Emge and Suzanne Emge as lead counsel.

4

5    **IT IS SO ORDERED**.

6  DATED:  September 30, 2015

7

8  **HONORABLE LARRY ALAN BURNS**
   United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28